CHARLES P. ARNOLD, Respondent, v. HARRY GRAHAM and ELMER GRAHAM, Defendants, HARRY GRAHAM, Appellant.

Kansas City Court of Appeals. February 9, 1925.

1. **MASTER AND SERVANT:** Negligence: Contributory Negligence of Workman, Injured by Falling into Ditch in Darkened Room, in Failing to Observe Where He Was Walking, Held for Jury. Where plasterer was injured by falling into ditch, located in darkened room, while on his way to toilet in adjoining building, and who on day previous to injury in going through room with other workmen crossed board bridging ditch, at time when room was lighted, and failed to observe presence of ditch, *held* not guilty of contributory negligence as a matter of law.

.2. ———: ———: Contributory Negligence of Plaintiff in Taking Dangerous Route Held for Jury. Plaintiff *held* not guilty of contributory negligence as a matter of law in taking what was for him a shorter and dangerous route to his destination, where he followed information of foreman as to route and it was not shown that he knew it to be dangerous.

3. ———: ———: Contributory Negligence of Plaintiff in Failing to Obtain Light or to Take Precautionary Measures for His Safety, While Walking Through Dark Room, Held for Jury. Whether plaintiff guilty of contributory negligence in passing through room which was wholly dark without taking any precautionary measures for his own safety, *held* for jury.

4. ———: ———: Whether Defendant Had Control Over Passageway in Room Where Plaintiff Was Hurt Held for Jury. Evidence *held* sufficient as against demurrer, to justify finding that defendant had as much control over room in which plaintiff was hurt as he had over entire building, thereby making it his duty to make passageway therein reasonably safe and to warn plaintiff of any danger in using the same.

5. ———: ———: Even Though Defendant Did Not Control Dark Passageway, Which Employees Were Required to Use, It Was His Duty to Keep Same Reasonably Safe. Even though defendant did not have control over dark passageway where plaintiff was hurt, where he knew or should have known that it was used by plaintiff and other employees as a means of egress and ingress, and of its dangerous condition, it was his duty to keep it in a reasonably safe condition and to have refused to proceed further with work until condition was remedied.

6. ———: ———: Master's Duty to Furnish Reasonably Safe Place Not Restricted to Identical Situs of Labor. The rule requiring master to furnish servant reasonably safe place in which to work is not restricted to identical *situs* of labor, but extends to all places about premises known to master to be used, or which might by use of ordinary care be known to be used by employees.

7. ———: ———: Defendant Required to Keep Passageway, Used by Foreman and Other Employees for Ingress and Egress, in Reasonably Safe Condition. Though there was another route for use of employees in going to toilet, and plaintiff when injured used a different route which was a private passageway, defendant was required to keep passageway in reasonably safe condition, where the same had been used by defendant's foreman and other employees as a means of entrance and exit, the knowledge of the foreman as to its use being knowledge of defendant.

8. ———: ———: Relation of Master and Servant Held to Exist at Time of Plaintiff's Injury. Where plaintiff arrived at place of work shortly before working time, and, when about to change clothes to get ready for work he was required to visit toilet, and was injured, *held* relationship of master and servant had begun and was not suspended by plaintiff going to toilet.

9. PLEADING: Improper Joinder of Causes of Action: Several Causes of Action Improperly Joined, Held Waived by Defendant Going to Trial after Overruling of His Demurrer. If there was any improper joinder of causes of action in petition such defect was waived by defendant in going to trial after overruling his demurrer.

10. **INSTRUCTIONS: Instruction as to Defendant's Duty to Warn, Not Erroneous as Not Limiting Dangers Warned Against to Those Connected With Working Place.** An instruction that it was duty of defendant to furnish reasonably safe place and to warn plaintiff of existence of dangers, *held* not erroneous as not limiting character of dangers to those connected with working place.

11. ————: **Instruction Not Erroneous in Not Submitting That Defendant Only Required to Warn Against Dangers at Places Under His Control.** An instruction *held* not erroneous because it did not submit that defendant was only required to warn against dangers at places under defendant's control, where defendant, as a matter of law, had such control over passageway at place of plaintiff's injury, that he was obliged to see that it was not dangerous, provided other matters submitted to jury were present.

12. ————: **Meaning of Instruction Held Clear and Not to Leave Question of Law to Jury to Decide.** An instruction that if doorway leading out of building was used by employees of defendant "in proper pursuit of their employment," and as a passageway to and from toilet, mentioned in evidence, *held* sufficiently clear, and that no question of law was left to jury to decide.

13. ————: **Instruction Not Erroneous as Requiring Defendant to do All Things Mentioned Therein.** An instruction that if defendant was negligent in failing to make passageway over ditch reasonably safe, either by a light or by covering it, or to warn plaintiff of existence of ditch, and that if defendant "negligently failed to do any of such things, *held* not erroneous as requiring defendant to do all things mentioned therein.

14. ————: **Striking Out of Portion of Instruction That Workmen in Unfinished Building Were Required to Exercise Greater Vigilance Than When Going into Finished Building Held Proper.** Striking out of portion of instruction that workmen employed in erection of unfinished building must use greater vigilance while therein than where building was completed, *held* proper as giving undue prominence to care required by workmen in unfinished building.

15. **DAMAGES: A Verdict for $5000 for Fracture of Arm, Resulting in Permanent Limitation of Functions of Arm and Shoulder, and Impaired Earning Capacity, Held Not Excessive.** Where plaintiff, a plasterer fifty-seven years old, received fracture of arm, resulting in permanent limitation of function of arms and shoulder, rendering him unable to work for period of seven months and inter-

fering with his occupation so that he received a dollar a day less than other workmen, a verdict of $5000 is *held* not excessive.

Appeal from the Circuit Court of Jackson County.— *Hon. Charles R. Pence,* Judge.

AFFIRMED.

*Clif Langsdale* for respondent.

*Lathrop, Morrow, Fox & Moore, Richard S. Righter* and *Winston H. Woodson* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $5,000 and defendant has appealed.

The facts show that on December 29, 1921, a church building was in process of erection on property located at the northeast corner of Eleventh street and Bennington avenue, in Kansas City, Missouri. The church faced west and was next to the priest's house, which was south of the church and next to Eleventh street. Ten feet to the north of the church was a school building, also a part of the church property. Defendant had contracted to do the plastering work on the church. The church was about sixty feet wide, north and south, and from ninety to 110 feet long, east and west. In the northeast corner of the church was a small room about sixteen feet long and twelve feet wide; in the southeast corner was a similar room but slightly larger. There was an area between the two rooms about twenty-four feet wide which was apparently left for the altar. In the west end, or the front of the church, were three large doors constituting the main entrance to the auditorium. These doors were used by the workmen as a means of ingress and egress when going and leaving their work in the morning

and evening. There were two doors on the south side of the church, one being located near the west end and another near the east end. There was a door on the north side which was boarded up and not used.

The rear or east ends of both the school and church were flush with an alley. There was an opening for a door on the north side of the church leading out of the small room on the northeast corner of the church and nearly opposite this door in a northeasterly direction was another door in the school building which led to a toilet therein. The whole area between the church and the school was open. Along the north wall of the northeast room in the church ran a ditch about two feet wide and three or four feet deep, which had been dug by volunteer church workers for the laying of steampipes. A plank had been placed across this ditch leading from the interior of the northeast room to the doorway in the north wall of the room; this plank was about ten feet long, two inches thick and twelve inches wide. The evidence does not disclose who placed the plank across the ditch but the testimony of all the witnesses was that the plasterers had nothing to do with either the digging of the ditch or the placing of the plank across it.

There was one window in the east wall of the northeast room, which was covered with burlap. There was a canvas curtain over the door opening, leading from the auditorium of the church to the northeast room and apparently another such curtain across the outer door-opening. Just how far the building had progressed toward completion is not shown in evidence but the outside walls and roof were in place, practically all of the ceiling plastered, and services were being held in the church. The window openings had not been filled with glass and as it was winter time, in order to keep out the cold all of them had burlap and tin on them shutting out the natural light. The church authorities had run an electric light wire from the school to the church and furnished the current for lights. In plastering the ceiling the de-

fendant used two incandescent light bulbs attached to extension drop cords which he furnished, which cords were connected with the wire furnished by the church authorities. Defendant was using a very high scaffold, the ceiling being fifty feet in height in the center, and as the work progressed would move the scaffold and lights from place to place. At the time in question the scaffold and lights were at the extreme west end of the building. Plaintiff, while on his way to the toilet in the school building, was injured by falling into the ditch in the northeast room, which was totally dark. He testified that the two cord lights did not shed any light "into this room" that he was "going to traverse."

On the morning of December 29th, plaintiff arrived at the church about 7:30 o'clock, the work was to begin at 8:00 o'clock. Services were being held in the church at the time of his arrival so the workmen waited without. The workmen, including defendant's foreman, were in the habit of changing to their work clothes in the southeast room where the clothes were kept. When the men reached this room plaintiff desired to go to the toilet, it was then about ten minutes to eight. As it was late, plaintiff asked the foreman how to get to the toilet in the school building from that room. The foreman told him to go through the northeast room in the church. Plaintiff had been working at the church for only one day at that time but sometime prior thereto had been on the work and worked then for a period of four days when he asked defendant to transfer him to other work "on account of the lights," which were of the same number and character as on the day plaintiff was hurt.

The toilet in the school building was the only one about the premises and defendant's employees were required to use it for this reason. Plaintiff had visited the toilet only twice prior to the time of his injury and on those occasions he went out the front door of the church, around the parsonage and up the rear alley, which was a much longer way than the one he attempted to use at the time he was hurt. Being desirous of finding a more

direct route, as it was ten minutes to eight and he had not yet changed to his work clothes, he inquired of the foreman about a way to the toilet. The foreman, testifying for defendant, stated that he and other workmen had gone through the little northeast room "off and on" to reach the toilet and to go to lunch. It seems that the workmen did not eat in the church for the reason that it was cold, so they would go to the basement of the school building for that purpose. Being advised by the foreman as to how he could reach the toilet, he at once proceeded to go through the northeast room, which he testified was so dark that he could not see his hand before him, and in going through it, as before stated, he stepped into the ditch, resulting in his falling against the stone wall adjacent thereto, breaking his arm. The foreman knew of the presence of the ditch and the condition of the room as to darkness.

The petition is based on four allegations of negligence: First, failure to furnish plaintiff with a reasonably safe place in which to work; second, failure to provide sufficient light in the room in which the ditch was located; third, failure to cover the ditch; fourth, failure to warn plaintiff of the existence and location of the ditch.

Defendant insists that the court erred in failing to give its instruction in the nature of a demurrer to the evidence for the reason that the undisputed evidence shows that plaintiff was guilty of contributory negligence as a matter of law. This point is based upon the contention that plaintiff was a plasterer of thirty-five years experience and that on the day prior to his injury he had ample opportunity to examine the condition of the place where he was injured, but failed to do so. The evidence in this respect shows that plaintiff and five other workmen on the day previous to the one in question went through this northeast room and the outer door to the school house where they ate lunch, at which time the outside door was open and the day was fair. Plaintiff testified that at that time he did not look down to see where

he was walking; that he did not know that he was walking across a board, and from this it was argued that plaintiff knowing that the building was in course of construction was guilty of gross negligence in failing to observe where he was walking. The evidence shows that this was the only time that plaintiff had been in the northeast room prior to the time of his injury. Assuming but not deciding that the incident of his walking through the room on the day before his injury is so closely connected in point of time under the circumstances with what occurred at the time plaintiff was injured as to be taken into consideration in determining whether he was guilty of contributory negligence as a matter of law at the latter time, we are not convinced that plaintiff was guilty of contributory negligence as a matter of law in not observing where he was walking on the day previous to that of his injury.

While it is true that the building was in course of construction, the conditions present and the amount of work being done by others at the time is not clearly shown in the testimony. There was certainly no evidence that the conditions were "shifting" as that term is used in connection with cases of this kind. There was testimony that "there were other workmen engaged off and on in other employment than the plastering around there," "building laborers, I think;" that steam fitters were putting in steam heat and that the floor was being graded. There is no evidence as to whether any work was being done other than plastering except that the floor was being graded and the steam heating apparatus installed. But whether this work was being done on the day plaintiff was injured or the day before is not shown in the testimony. The best we can get from the testimony on the point is that this work was being done about that time, but it would seem there is an inference that only the plasterers were engaged in the building on those days as there were no lights except at the place high above the floor where they were working.

On the day previous to his injury, plaintiff in going through the room in which he was injured, was immediately behind five men with the light shining in his face. He could not be convicted of contributory negligence as a matter of law in not looking down while these men were going on through in front of him, seeing that they were going right along and that no mishap occurred to them. Unless it is the duty of the servant working in a building in course of construction to examine carefully every place in which he goes in the building to see if there are any obstructions or pitfalls that he might later come in contact with, we do not think there is anything in the contention. We cannot say as a matter of law that plaintiff under the circumstances was required to make such an examination of the room in which he was injured. It is true that the evidence shows that he came back through this room after eating his lunch but under what circumstances or conditions is not shown in the testimony.

It is next insisted that plaintiff was guilty of contributory negligence as a matter of law ''in attempting to take what was for him a dangerous route to his destination, of the perils of which he was ignorant, when he knew of two safe routes which he could have used.'' The evidence shows that plaintiff could have gone out of one of the front doors of the church and around between it and the school building and reached the toilet in this way. If he had taken this route, he would have traversed in going and returning a distance of from 450 to 500 feet. Had he gone out of the door on the south of the church and near the east end thereof, he would have traversed a block and a half, for the reason that there was an embankment and retaining wall which would have obstructed his passage and to avoid which he would have been required to go around the parsonage. So, in order to save time and being late, he followed the information given to him by the foreman, who had been upon the work for a long time and was fully acquainted with the conditions, and took the shorter route. If this route had been known to him to have been dangerous, there might

219 Mo. App.—17.

be some merit in defendant's contention but it was not so known to him, nor did he have any information or cause to believe that any danger existed in the room. There is no evidence that there was anyone in the room on that day or at any time to plaintiff's knowledge who might be leaving things around to fall over or obstructing the passageway with material. Plaintiff had passed over this passage with safety the day before. The room was dark and it was not reasonable to suppose that any work was going on in it.

It is next insisted that plaintiff was guilty of contributory negligence in walking through the room where he was injured "without taking any precautionary measures for his own safety." The evidence shows that the room was wholly dark. It is insisted that plaintiff should have struck a match or held back the curtain over the doorway so that the light from the auditorium could have shone in and illuminated his path and that he was not cautious as to how he stepped when he knew he was using unfinished premises. Contributory negligence is a matter of defense. If the matters now urged were of any moment to defendant in the lower court, the case was very loosely tried on this point. There is but one shred of evidence as to how and in what manner plaintiff proceeded through this room and to which defendant tenaciously clings. This was brought out by plaintiff's own counsel and is as follows:

"Q. What did you do when he told you that? A. I started to go out the door, and it was so dark I couldn't see, and *I went right along and fell in the ditch.*"

Defendant draws many inferences from this testimony as to what plaintiff did not do but as the verdict was against defendant we are not drawing inferences in his favor but rather in favor of plaintiff. This testimony may be construed as meaning that plaintiff when he saw the room was dark, did not retrace his steps or stop but continued to walk forward. It is not a statement that he failed to be cautious in his gait or manner in which he placed his steps. Possibly it may also be subject to the

Arnold v. Graham.

construction that he did not light a match or hold back the curtain over the door, but it is by no means certain that the holding back of the curtain would have been of any benefit for the reason that there were but two small lights in this immense auditorium with all the outside openings covered up, and these were located approximately 100 feet away. Plaintiff testified that these lights shed no light into the room which he was about to traverse. The man who went to plaintiff's assistance stated that he saw the ditch by holding back the canvas over the door; but this evidently referred to the outside door.

The case of Shuck v. Security Realty Co., 201 S. W. 559, and like cases cited by the defendant are not in point. In that case plaintiff fell down a dark stairway which he had built himself. He fell at a time when he did not make use of any light, although he had previously done so, but felt for a railing that he knew was not present. That is a far different case from the one in which the injured party did not know of the dangerous situation. While there was no ''assurance of safety,'' as that term is technically understood, by the foreman in advising plaintiff of the route to take to the toilet, still the foreman did not tell plaintiff of the ditch in the room. Could not plaintiff assume that the foreman would not advise him to go through a dark room if there were any pitfalls in it? In this connection defendant says that it is not shown that the foreman knew that plaintiff had not been through the room before and that the foreman could assume that plaintiff was not unacquainted with it. But there is an inference that the foreman knew that plaintiff was not familiar with the room as plaintiff asked the foreman for a direct way in which to reach the toilet. If plaintiff had been constantly using the room as a passageway and was familiar with it, he would not have asked the foreman about a way to the toilet as concededly the most direct way was through the northeast room. It must have been as a result of a temporary lapse of memory that plaintiff did not remember from his experience in going through this room on the day before

that it was a short route to the school building and hence to the toilet. These questions were all for the jury to weigh, *pro* and *con*.

It has been held that it is not contributory negligence for a person to fail to look out for danger when under the circumstances he has no reason to suspect that danger was to be apprehended. [Langan v. Railway, 72 Mo. 392.] We think that plaintiff is not to be charged with contributory negligence as a matter of law for failure to obtain a light.

It is next insisted that the demurrer to the evidence should have been sustained for the reason that "the facts shown in evidence raised no legal duty in appellant either to make safe the place where the accident occurred or to warn respondent of any danger that might there exist." In this connection it is insisted that defendant was not a general contractor but only had the plastering contract for the church and undertook to occupy and control only that portion of the premises where his work was being carried on; that he did not undertake to exercise any control over any other part of the church; that the windows were covered by the church authorities; that the ditch was dug by the church authorities and the plank was not placed over it by the plasterers; that defendant undertook to light only that portion of the building where his work was going on; that he did not occupy the room in which plaintiff was injured by doing work or by having any material there or by ordering or directing the men to go there for the purpose of working.

Defendant testified that he "occupied the auditorium and worked in the room." "Q. That is you were plastering the auditorium? A. Yes. Q. Did you undertake to occupy or light or otherwise exercise any control over any other portion of the premises? A. No, sir." From this testimony it will be seen that defendant admitted that he was occupying the auditorium and his work was in the large room or auditorum of the church. In view of the evidence and common sense, the claim that defendant occupied only the exact spot where the plas-

tering was being applied is without merit. At another place in his testimony defendant stated that he had the plastering for the whole church including the two small rooms that we have mentioned, but that he had not yet reached them in his work. However, there was nothing to prevent him from starting the work in the room in which plaintiff was injured at any time he thought fit. He could have moved his scaffold and lights into that room the very day in question or the very minute after plaintiff was injured. The only difference between the auditorium and the room in which plaintiff was injured, so far as defendant is concerned, is that there was a partition between the two places. There is an inference from the evidence that no one else was doing any work in the building on the day plaintiff was injured than defendant and his men. He had as much control over the room in which plaintiff was hurt as he had over any part of the building. As was stated in Clark v. Union Iron and Foundry Co., 137 S. W. 577, 582—

". . . when the railway company made the contract with Stewart & Son to construct the coal chute (which the evidence shows was being constructed on the premises of the railway company), by implication it agreed that the contractors and subcontractors, the re-spondent, and their employees, might go upon its prem-ises and *do all things that were necessary to accomplish that purpose.*" (Italics ours.)

Even had the evidence shown that defendant did not have any control over the passageway where plaintiff was hurt, and we think there is an inference from the evidence that he did, yet it must be said that it was the duty of the defendant to keep it in a reasonably safe con-dition for the reason that he continued with his work when he knew or should have known that it was used by plaintiff and other employees as a means of egress and ingress from the situs of the work. If he had no control over this room so that he could have remedied the condi-tions therein, he could have required the church author-

ities to have done so or have refused to proceed further with the work of plastering until the condition was remedied. See Ford v. Dickinson, 217 S. W. 294, 300, where it was said—

"The master is bound to exercise ordinary care to make the place where his employees work reasonably safe; and, where he contracts to do the work on the premises of another, and retains direction and control of the work, the general rule applies, and he must exercise the same care for the safety of his employees that the law imposes on him on his own premises. [Clark v. Foundry Co., 234 Mo. 436, loc. cit. 454, 137 S. W. 577, 45 L. R. A. (N. S.) 295; Penn Steel Co. v. Nace, 113 Md. 460, 77 Atl. 1121, 45 L. R. A. (N. S.) 281.] Defendant receiver was not required by law to operate the switch tracks in the millyard under conditions dangerous to his employees, if it was practicable and feasible for such dangerous conditions to be removed. If he had no such control that he could have removed such conditions himself, he could have required the milling company to have done so, or refused, until such change, to do its switching."

And since defendant continued to do the work, under the circumstances it was his duty to make the passageway in the room in question reasonably safe.

It is well settled that the rule requiring the master to furnish the servant with a reasonably safe place in which to work "is not restricted to the *identical situs* of the labor, but extends to the exercise by the employer of ordinary care to see that the means of egress and ingress are ordinarily safe, and extends to all places about the premises, known to the master to be used, or which might by the use of ordinary care be so known to be used, by the employees." [Jackson v. Butler, 155 S. W. 1071, 1076; Behncke v. Mining Co., 175 S. W. 271; Martin v. Richmond Cotton Oil Co., 184 S. W. 127; Hake v. Buck's Stove & Range Co., 234 S. W. 1061; Bidwell v. Grugg, 201 S. W. 579.]

However, it is insisted that the regular way of going to and from the work was through the front door of the church and that although defendant's foreman and his employees used the passageway through the room in which plaintiff was injured. this was a private passageway, merely being used for their convenience. It is true that defendant denied that he ever designated the door of this room as proper means of exit. If what is meant by private passageway is that it was unknown to the master, then there is no merit in this contention for the reason that the foreman was the *alter ego* of the defendant. This room where plaintiff was injured had been used by the foreman and his men from the time they started the work of plastering. They had used this passageway just as freely as they had used the front door as a means of entrance and exit. It will not do to say that the master did not know about its use or consent to it when the foreman himself with his men used it. Under the rule laid down in the case of Jackson v. Butler, and other cases cited by us, it is readily seen that there is no merit in the contention that the rule of a safe place in which to work did not extend to the room where plaintiff was injured; this means of egress and ingress was known to the master and should have been known by him to be used by his employees for such purposes.

We have carefully read the cases cited by the defendant and find them not in point. The case of O'Brien v. Western Steel Co., 100 Mo. 182, was one where deceased and other employees of the defendant for their own convenience and on their own initiative and at their own expense, arranged for refreshments in the form of ice water on an upper floor of a building other than the floor where deceased was engaged in his work, and it was while returning in an elevator from this upper floor where he had gone to get ice water that deceased was killed. The employer merely suffered the use of the elevator by the employees for the purpose mentioned. It does not appear in that case that the going for ice water

was reasonably necessary in connection with deceased's employment nor was the place where deceased was injured a point used as a means of ingress or egress to and from the work being done. The court held that he used the elevator merely as an implied licensee. That case is not similar to the one at bar. The use of the toilet was necessary as an incident of plaintiff's being employed and engaged at the plastering work being done. It was the only toilet around and the passageway through the room was a means of ingress and egress known to the master.

It is insisted that the relation of master and servant did not exist between plaintiff and defendant at the time of plaintiff's injury, first, because the relation had not begun at that time and, second, because if it had begun, it was suspended by plaintiff's leaving the premises for purposes of his own. As to the first point, the evidence shows that plaintiff arrived at the premises at 7:30 and was to go to work at eight o'clock. He was required to wait outside the church because services were going on within. As soon as the services were over he, together with the other workmen and defendant's foreman, repaired to the southeast room, where their work clothes were located, for the purpose of changing. When they reached this room and before changing his clothes, plaintiff was required to visit the toilet and in doing so was injured.

It is not required that the servant be actually engaged in the work which he is employed to do in order for the relation of master and servant to be present. Plaintiff was not loitering about the premises prior to his going to the room for the purpose of changing his clothes but was waiting there for a purpose as it was thought not proper to enter the church while services were going on. At the time he was injured he was on the premises where he worked. As was said in Marshall v. United Rys. Co., 184 S. W. 159, 162—

''The master's duty to the servant is not necessarily confined to the precise period for which services are actively rendered, nor restricted to the identical situs of the labor.''

Defendant cites the case of Flannigan v. I. C. Rys. Co., 208 S. W. 441. The facts in that case are entirely different from those in the case at bar. In that case plaintiff was not regularly at work for the defendant but had remained away from the work for sometime on account of an injury he had received. Defendant had not been notified that plaintiff had come back to work on the day that he was hurt nor did it know that he was there. Plaintiff was injured in a sand house where he had gone to warm before going to work but there does not appear that there was any necessity for his going there. The case at bar is more like the English case of Sharp v. Johnson, which was quoted from at length in the case of Flannigan v. Railways, supra. The English case held that a reasonable margin of time before the actual commencement of the work, while the servant is upon the premises of his master, can be considered as coming within the period of employment. Of course, what is a reasonable margin of time and what the servant is doing during that time, would have a material bearing upon the question. If during that time he was merely loitering about the premises of the master and engaged in some act wholly disconnected with the business of the master and for the servant's own business or pleasure, the relationship of master and servant could not be said to exist. But in this case, as before stated, plaintiff was not loitering about the premises but had gone to change his clothes in order that he might engage in the active business for which he was employed. It was while he was so occupied that he was required to go to the toilet and was injured. We think there is no question but that there was evidence that the relation between plaintiff and defendant was such that at the time of plaintiff's injury defendant was required to furnish him with a reason-

ably safe place in which to work. That the relationship was not suspended because plaintiff was in the act of leaving the premises under the circumstances, is beyond question. [Jackson v. Butler, supra, l. c. 1076; Marshall v. United Rys. Co., supra; Behncke v. Mining Co., supra; Martin v. Richmond Cotton Oil Co., supra; Hake v. Stove Co., supra.]

It is insisted that defendant's demurrer to plaintiff's petition should have been sustained for the reason that several causes of action were improperly joined. If, as a matter of fact, there was any improper joinder of causes of action in the petition, this defect in the petition was waived by defendant when he went to trial after the overruling of his demurrer. [Rutledge v. Tarr, 95 Mo. App. 265; Roberts v. Lead Co., 95 Mo. App. 581.]

Complaint is made of plaintiff's instruction No. 1. This instruction is very long and it would not serve any useful purpose to set it out. The first paragraph states that it was the duty of defendant, while plaintiff was in his employ, to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work or to warn plaintiff of the existence of dangers, if any, known to the defendant, or which could have been discovered by the exercise of ordinary care, that his duty was not limited to the exact working place of plaintiff but extended "to those means of egress and ingress" connected with the building where plaintiff was required to work, and known of which should have been known by the defendant to be used by the plaintiff and other employees "in the proper pursuit of their employment. And this was true regardless of whether or not defendant was in control of said portions of the said building at said time." The contention is made by the defendant that this part of the instruction told the jury "that defendant had a duty to warn plaintiff of the existence of dangers, without specifying that those dangers must be dangers connected with the working place. There is in the instruction no limitation or definition of the character of

the dangers to be warned against, or limitation of the scope of such duty to warn." We think there is no merit in this contention. The dangers to be warned against were those existing at exact working places and those which extended to places used by employees as a means of egress and ingress with the knowledge, actual or constructive, of the defendant. The remaining part of the instruction describes in great detail the ditch and the conditions surrounding it and plainly indicates to the jury the character of the dangers to be warned against.

It is complained that the defendant was only required to warn against dangers at such places as were under the control of the defendant and that this is not submitted in the instruction. From what we have said there is no merit in this contention, the place must have been under defendant's control provided the other matters submitted were present. Aside from this, it will be seen from the authorities we have quoted that as a matter of law defendant had such control over the passageway that he was obliged to see that it was not dangerous, provided the other matters submitted to the jury were present. We have carefully examined the case of Loehring v. Construction Co., 118 Mo. App. 163, and Powell v. Electrical Co., 195 Mo. App. 150, cited by the defendant. It is so apparent that these cases are not in point that we would not be justified in prolonging this opinion by entering into a detailed discussion of them.

Complaint is made of another part of the instruction because it tells the jury that if a doorway leading out of the building from the northeast room was a doorway used by the employees of the defendant "in the proper pursuit of their employment and as a passageway to and from the toilet mentioned in evidence, and that defendant knew that said doorway was so used," etc. It is contended that what is meant by "proper pursuit of their employment" is not clear. However those words are followed by the words "and as a passageway to and from the toilet mentioned in evidence." We think

what was meant in the instruction is clear, and that no question of law is left to the jury to decide. From what we have said there is no merit in the complaint against the instruction because it allows the jury to find negligence in failing to make a passageway over the ditch reasonably safe, either by a light or by covering it, or in failing to warn plaintiff of the existence of the ditch and because it says "if you further find that defendant negligently failed to do *any* of such things, your verdict should be for the plaintiff." In this connection defendant urges that it was not in control of the room in which plaintiff was injured and, consequently, was not required to do the things mentioned in the instruction. From what we have said there was nothing in this contention. Neither is there anything in the instruction requiring the jury to find that defendant was required to do all of the things mentioned in the instruction on the ground that it has the jury find "that defendant negligently failed to do *any* of such things."

The court properly refused defendant's instructions Nos. 6, 8 and 10. These instructions embodied defendant's theories that we have already disposed of against defendant. The court likewise did not err in refusing defendant's instruction No. 7. This last instruction in the first part explains to the jury that defendant was only required to use ordinary care and unless he failed to do so, plaintiff could not recover nor could plaintiff recover if the injuries were caused or contributed to by the failure of plaintiff to exercise ordinary care. What is meant by ordinary care was explained to the jury in another instruction, which is in the approved form. Defendant's instruction No. 7 then concludes as follows:

". . . and in this connection you are instructed that a workman employed in the erection of an unfinished building under construction must, in the exercise of ordinary care for his own safety, while on such premises, use greater vigilance than he would be called upon to use in going into a completed and finished building."

The court struck out that portion of the instruction that we have quoted but gave to the jury the first part of the instruction. We think that the action of the court is not ground for reversal. The part of the instruction quoted gives undue prominence to the matter of the amount of care required by the workmen in going into an unfinished building. It may be conceded that ordinarily one should use a greater degree of caution while on the premises of an unfinished than on those of a finished building, but the difference in the caution to be exercised would depend entirely upon the condition of the unfinished building. To go into some unfinished buildings at some particular stage of their erection might be very dangerous while to go into a building that is almost entirely finished and no dangerous work is being carried on, could be done with almost as little caution as to go into a wholly finished building. The jury was fully instructed on the question of ordinary care.

It is insisted that the verdict is excessive. In this connection the evidence shows that there was a fracture of the humerus near its upper end, described as a fracture of the "anatomical neck of the humerus." The process known "as the greater tuberosity" was completely separated from the bone. In nature's effort to heal the fracture it threw out an accumulation of bone upon the humerus at the point of fracture. This growth extended out to such a degree and is so near the bones of the shoulder that in raising the arm the protrusion comes in contact with the "acromion process," which is on the forward end of the shoulder blade. This causes a limitation in the movement of the arm. The percentage of limitation is not disclosed but it was shown that plaintiff could not extend his arm in a horizontal position upward from the body or upward in a direct line or backward to a normal position. He is required to move his entire shoulder to get any motion in either one of these directions. His shoulder blade moves with the head of the bone and sweeps over and back to accommo-

date the position he wishes to acquire. This condition limits the tendons, ligaments and muscles in their ability to move ''because of the bony locking.'' This condition of the limitation of the function of the arms and shoulder is permanent. It is ''fixed forever.'' An operation to remedy the condition might be successful but surgeons are slow in recommending such an operation because it might cause damage to other parts of the bone of such a character as to make the condition worse.

Plaintiff was fifty-seven years of age the month following his injury; he went to a hospital where a plaster cast was put on his shoulder and remained there for about six weeks. For a month or more after the cast was removed he visited the physician's office three or four times a week and the doctor administered massage and manipulation. He was idle for seven months after his injury and suffered pain during this time. At the time of the trial he testified that he continued to suffer whenever he moved his arm a ''little too far;'' that when he returned to work his arm bothered him in getting his ''hand up.'' He can ''do work pretty well with it now.'' However, it gives him pain and ''bothers'' him because of the limited movement. At the time of his injury he was earning $9.60 a day; when he returned to work he was compelled to work for one dollar less than other workmen. An injury of the kind from which plaintiff suffers, in view of his calling, is a very serious one and we are not prepared to say that a verdict of $5,000 is so out of line as to justify us in interfering with it.

The judgment is affirmed. All concur.